490 P.2d 428

Arthur H. WOOD, Petitioner,

v.

The INDUSTRIAL COMMISSION of Arizona, Respondent,

Gordon S. Sanders and Mark S. Sanders (Sanders Construction Company Limited), Respondent Employer,

State Compensation Fund, Respondent Carrier.

No. 1 CA–IC 346.

Court of Appeals of Arizona, Division 1, Department A.

Nov. 9, 1971.

Gorey & Ely by Herbert L. Ely, Phoenix, and William J. Meyers, Flagstaff, for petitioner.

William J. Wahl, Jr., Chief Counsel, The Industrial Commission of Arizona, Phoenix, for respondent.

Robert K. Park, Chief Counsel, State Compensation Fund, by Arthur B. Parsons, Phoenix, for respondent carrier.

DONOFRIO, Judge.

This is a review by writ of certiorari to test the lawfulness of an award and findings of The Industrial Commission of Arizona for noncompensable claim issued on September 4, 1969.

Petitioner herein suffered a myocardial infarction at approximately 7:30 a. m. on April 7, 1967, while at a jobsite at the Sunset Crater National Monument near Flagstaff where he was working as a superintendent for respondent employer. Based upon the initial reports, the Commission issued a noncompensable award. This was protested and a hearing, which is covered by the first transcript, was held at which the petitioner's attending physician, Leo Jerome Ankenbrandt, M.D., appeared and was examined and cross-examined. (Due to a severe snowstorm in the area, the attorney for the State Compensation Fund did not reach the hearing until some thirty-two pages of the transcript had been taken.)

In answer to a hypothetical question proposed by petitioner's counsel, Dr. Ankenbrandt testified that he felt there was a correlation, at least in part, between petitioner's activities between March 29 through April 2, 1967, and his heart attack which occurred on April 7, 1967. He based his opinion on the fact that he felt petitioner suffered emotional anxiety as well as physical stress directly related to his employment.

At this hearing petitioner contended that he had been under severe strain from March 29 through April 2. He testified that there had been severe snowstorms, necessitating his visiting the jobsite day and night to ascertain that a portable heater was in operation, drying recently poured cement slabs. He testified that during the twenty-four-hour period prior to the heart attack he had done his regular work during the day; Thursday, in grading and preparing to pour another floor slab; that he retired at 7:30 Thursday evening and arose at 5:30 on Friday morning; that he left for the jobsite some time before 7:00 o'clock and reached it shortly after 7:00, a. m. He was asked and answered as follows:

"Q And what activites did you perform the morning of your heart attack?

"A Well, when it hit me, I was uncovering this ground getting it ready for the truck that I knew was coming.

"Q And was anyone assisting you in that activity?

"A No. I was the only one there.

"Q Did you ever see the cement truck that morning that was to deliver concrete for the new pour?

"A Well, that's a hard one for me to answer. I—I can faintly remember seeing it, but where, I can't tell you."

At the conclusion of this first hearing it was agreed by counsel that the file would be submitted to the cardiovascular advisory board for a file review. This was done, and the board returned an opinion, the pertinent part of which was as follows:

"We have paid particular attention to the testimony of the patient's seemingly unusual work from March 29 through April 2, 1967. We have paid particular attention to the patient's testimony for evidence of what the patient said he did. It is learned that the myocardial infarction occurred five days after cessation of the

unusual work, and it is further learned that for the twenty-four hours preceding the onset of the acute myocardial infarction the patient's work was usual and customary.

"On the basis of the foregoing, it is our opinion that the myocardial infarction sustained on April 7, 1967 was not industrially related but rather was the outgrowth of underlying arteriosclerotic heart disease."

Following a petition, a second hearing was held. At this hearing the petitioner elaborated to a considerable degree upon his activities on the day he suffered the myocardial infarction. He stated that he had passed the cement truck on the way to the jobsite, and was hurrying to remove the stones and wood pieces weighing down a polyethylene tarp which covered the slab site. He testified that he was carrying "somewhere around 70 pounds to the load", and that he had carried four such loads a distance of 70 feet. In addition, he had moved 8 or 10 rocks weighing from 20 to 50 pounds, from 10 to 50 feet, and moved two 50-pound tarps, carrying them each 50 feet. He stated that he had performed this "in a rush to get ready."

Dr. Alan A. Gordon, a member of the consultation board, was presented a hypothetical question which included the additional testimony concerning petitioner's activities on April 7, the day he suffered the infarction. The doctor responded as follows:

"* * * Before I answer I must say that I do not recall if this type of work as described by Mr. Ely was usual and customary work for the Claimant. If I assume that his work was basically supervisory and that he did not usually remove these cloths, tarpaulins, logs, rocks and so on, then it would be my opinion that this was unusual work for him and may well have played some role in the development of this infarction."

Dr. Allan I. Cohen also a member of the consultation board, was cross-examined in terms of abstract medical reasoning and generalized medical principles, however at no point was he presented with hypothetical question concerning petitioner's activities on the morning of April 7, as had been presented to Dr. Gordon. On direct examination by the Commission counsel, Dr. Cohen was questioned as to his opinion of a causal relationship between the myocardial infarction and the activities of petitioner's employment as they were set forth in the first transcript. On re-cross-examination Dr. Cohen was asked and answered as follows:

"Q    No, you asked me about bed rest. I want to ask you another question about being at bed rest. Assume, doctor, from March 29 to April 2 that the claimant did no physical activity whatsoever, and to emphasize that assume he was at bed. rest during that period of time. Would your opinion be, doctor, that nevertheless he would have suffered an infarction at exactly the same time that he did on the basis of what you have before you in the transcript?

"A    Are all the other circumstances the same except from the interval March 29 to April 2 he was for some reason or another at bed rest?

"Q    Yes, would the infarction have occurred in your opinion at precisely the same time that it did occur?

"A    Based on the facts available to us at the time of the review of the chart, his activities from March 29 to April 2, no matter what that activity, would have no influence whatever on the occurrence of the heart attack of April 7.

"Q    Now, doctor, I know that you might have felt that you answered the question, but I want to make sure that the question is answered, so let me just repeat it. Is it your opinion, doctor, that if he was at bed rest from March 29 through April 2 and was not doing this unusual work that he was doing, that the infarction would have occurred at ex-

actly the same time that it did occur?

\* \* \*

"A Yes, I think the infarction would have occurred had he been at bed rest from the period of March 29 to April 2."

At no time was Dr. Cohen presented with the facts which were elucidated later in the hearing with regard to the petitioner's strenuous lifting and carrying in relation to moving the tarps for the ten or fifteen-minute period prior to his suffering the myocardial infarction.

We are thus left with this state of the medical evidence: Dr. Enkenbrandt testified that there was a relationship between the type of work petitioner was doing from March 29 to April 2 and the myocardial infarction. When presented with the hypothetical question which developed the petitioner's strenuous activities on the morning of the infarction and just prior thereto, Dr. Gordon testified that taking this into consideration it would be his opinion that this work was unusual and may well have played some role in the development of the infarction. Dr. Cohen was never presented with the facts of strenuous activity on the morning of the infarction as developed in the second transcript. He was not given an opportunity to express his opinion based on this set of facts.

Petitioner's testimony was uncorroborated due to the fact that he was working alone at the time the incident occurred, however no attempt was made by counsel for the Fund to impeach the petitioner's testimony. As we have stated:

"\* \* \* [T]estimony of an interested witness may not be disregarded by the Commission unless such testimony has been impeached or contradicted or circumstances are such as to cast doubt upon its credibility. Reed v. Industrial Commission, 3 Ariz.App. 597, 416 P.2d 1018 (1966)." Jeter v. Cudahy Packing Company, 4 Ariz.App. 571, 573, 422 P.2d 402, 404 (1967).

The petitioner's credibility was not the basis upon which the referee rendered his decision. Examining the referee's report, he states:

"\* \* \* Dr. Alan Gordon, one of the cardiovascular experts, testified that if the work Mr. Wood did on the morning of the infarction was indeed unusual, then such work 'will have played some role in the development of this infarction.' Dr. Allan Cohen, another member of the cardiovascular board, testified that generally speaking work may be a factor in the development of an infarction where the work exceeds the physical capabilities of the individual.

"We must then consider whether the work that the applicant did on the morning that he suffered the infarction was indeed usual and ordinary work for him, or whether it was unusual and did, in fact, exceed his physical capabilities.

"After reviewing the entire record, your Hearing Officer does not feel that the work which Mr. Wood did on the morning of April 7, 1967 was unusual for him. While his job was that of a supervisor, it is apparent that he was a working supervisor."

This opinion of the referee is not supported by the evidence. The petitioner was extensively cross-examined concerning his duties in former employments as well as in his current employment. His responses indicated that he was employed in a supervisory capacity for the respondent employer on a year-round basis, in charge of hiring and firing, reading blueprints, reading specifications, making receiving records, and keeping daily time sheets for his crew. He testified that at times he assisted the carpenters and cement finishers, but in a very limited way. When asked if he helped unload lumber, he stated that he did, in that he would check the invoices against purchase orders. There is no testimony to indicate that he was usually or customarily called upon to hastily perform heavy physical labor as he did on the morning of April 7, the day of his infarction.

It is the opinion of the Court that the award must be set aside as not supported by the evidence.

The award is set aside.

STEVENS, P. J., and CASE, J., concur.